# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 07-11047 (CSS) |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., <u>et al.</u>, | (Jointly Administered) |
| Debtors. | |
| AMERICAN HOME MORTGAGE INVESTMENT CORP., | Adversary Proceeding Case No. __-_____ (CSS) |
| Plaintiff, | |
| v. | |
| LEHMAN BROTHERS INC. and LEHMAN COMMERCIAL PAPER INC., | |
| Defendants. | |

## COMPLAINT

Plaintiff American Home Mortgage Investment Corp., a debtor in possession in the above-captioned chapter 11 cases ("**AHMIC**"), as and for its Complaint against Lehman Brothers Inc. ("**Lehman, Inc.**") and Lehman Commercial Paper Inc. ("**Lehman Commercial Paper**," and with Lehman, Inc., "**Defendants**" or "**Lehman**"), states as follows:

## PRELIMINARY STATEMENT

1. This is an action for breach of contract, turnover, conversion, and unjust enrichment brought by AHMIC against Lehman, a highly sophisticated party with an intimate understanding of the private-label notes it sold AHMIC shortly before AHMIC's bankruptcy filing. Just days after Lehman financed AHMIC's purchase, Lehman took advantage of AHMIC's liquidity problems in a scheme to foreclose on these valuable notes for a quick profit. Hiding behind the temporarily dysfunctional market for the notes, Lehman misrepresented that the "Market Value" (a defined term under their financing agreement (the "MRA" as defined

- 1 -

below)) of the financed notes suffered a steep decline that required AHMIC to provide millions of dollars in alleged margin deficits or else Lehman would foreclose.

2. Lehman knew fully that the Market Value of the Subordinated Notes had not changed since the prior margin call days before. Moreover, Lehman made no effort to obtain bids from a "generally recognized source" to value these notes, and one of the most significant trades had just occurred when Lehman sold the notes to AHMIC at 97% of their face value. Notwithstanding the temporary turmoil in the credit markets, the notes' rating had not changed, and they were protected against value degradation in any event through swap agreements. Lehman understood this structure all too well, having been the chief architect of the Broadhollow-Melville warehouse securitization program pursuant to which the notes were issued. Lehman knew these notes were close to being "money good."

3. Liquidity problems prevented AHMIC from satisfying Lehman's July 26, 2007 margin call. Thereafter, AHMIC filed for bankruptcy protection, and Lehman asserted that its unmet margin call constituted an Event of Default warranting termination of AHMIC's financing agreement and Lehman's foreclosure on the notes. In so doing, Lehman did nothing short of "stealing" property of AHMIC's bankruptcy estate.

4. AHMIC therefore brings this action for the benefit of its bankruptcy estate, seeking a determination that, among other things:

- Lehman breached the MRA by (i) fabricating values for the notes and representing them as "Market Value" determinations, (ii) asserting the existence of a "Margin Deficit" based on such false pretenses, (iii) asserting the existence of a pre-petition Event of Default when none existed, (iv) acting in violation of the implied covenant of good faith and fair dealing, and (v) not acting in a commercially reasonable manner;

- Lehman's termination and liquidation of the financing transaction with respect to the Subordinated Notes violated the automatic stay imposed under section 362 of the Bankruptcy Code;

- Lehman has wrongfully taken possession of $84,125,000 of Subordinated Notes provided as collateral under the MRA;

- The MRA is not a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code because the Subordinated Notes do not meet the definition of "mortgage-related securities" -- they were rated "BBB" by Standard & Poor's and "Baa2" by Moody's;

- Lehman is not entitled to the "securities contract" safe harbor of section 555 of the Bankruptcy Code because the Lehman entity that was a counterparty to the purported repurchase transaction with AHMIC is not a "stockbroker, financial institution, financial participant, or securities clearing agency;"

- In accordance with section 542 of the Bankruptcy Code, Lehman must turnover either (i) the Subordinated Notes or (ii) in the event that the safe harbor of section 555 does apply, the debt owed by Lehman for damages arising from Lehman's termination of the MRA and subsequent foreclosure on and/or liquidation of the Subordinated Notes; and

- In the event Lehman is entitled to the "securities contract" safe harbor of section 555 of the Bankruptcy Code, the determination of damages owed by Lehman must be made in accordance with section 562 of the Bankruptcy Code because commercially reasonable determinants of value do not exist.

## PARTIES

5. Plaintiff AHMIC is a Maryland corporation having its principal place of business in Melville, New York. AHMIC is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

6. Lehman Inc. is a Delaware corporation with its principal place of business in New York, New York.

7. Lehman Commercial Paper is a New York corporation with its principal place of business in New York.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408, 1409. This proceeding is a core proceeding under 28 U.S.C. § 157(b), arising in a case under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").

## FACTUAL BACKGROUND

A. **Broadhollow And Melville Securitization Program**

9. Prior to their bankruptcy filings, AHMIC and its affiliated debtors and debtors in possession (the "**American Home Parties**") funded a portion of their mortgage origination through structured financing techniques. The American Home Parties sold mortgage loans to certain special-purpose entities ("**SPEs**"), which financed the acquisition through the issuance of highly-rated (i.e., "A-1+" by Standard & Poor's) commercial paper and lower-rated subordinated notes.

10. Lehman was the architect of the American Home Parties' warehouse securitization program for two SPEs, Broadhollow Funding, LLC ("**Broadhollow**") and Melville Funding, LLC ("**Melville**"). Under the program, Broadhollow and Melville acquired thousands of mortgage loans from two mortgage loan originators, American Home Mortgage Acceptance, Inc. ("**AHMA**") and American Home Mortgage Corp. ("**AHMC**"), respectively. The acquisitions were financed by issuing commercial paper and subordinated notes.

11. Pursuant to the Base Indenture dated as of May 27, 2004 among Melville and Deutsche Bank Trust Company Americans (and various supplements thereto), Melville issued a single variable funding note to Broadhollow in exchange for a loan extended from Broadhollow to Melville in the original principal amount of approximately $168,000,000. Melville used the proceeds of that note to purchase mortgage loans.

12. Broadhollow issued commercial paper in the form of secured liquidity notes (the "**Senior Notes**"), and its obligations with respect thereto were secured by liens on the mortgage loans it purchased. Broadhollow also issued certain subordinated notes (the "**Subordinated Notes**"), which were likewise secured by the mortgage loans. The Senior Notes and Subordinated Notes were issued pursuant to the Base Indenture dated as of May 27, 2004 among Broadhollow and Deutsche Bank Trust Company Americas, and various supplements

thereto, including that certain (a) Series 2004-A Supplement To Base Indenture, dated as of May 27, 2004 (and the notes issued thereunder, the "**Series 2004-A Notes**"), and Series 2005-A Supplement To Base Indenture, dated as of June 7, 2005 (and the notes issued thereunder, the "**Series 2004-A Notes**").

13. Standard & Poor's rated the Subordinated Notes "BBB," and Moody's rated the Subordinated Notes "Baa2." Neither agency took any action with respect to those ratings until August 6, 2007.

14. As the architect of the program, Lehman had an intimate understanding of the value of the Subordinated Notes. A summary of Lehman's structure appears below:[1]



---

[1] This chart initially was extracted from the document entitled "Lehman Brothers: American Home Mortgage Investment Corp. Warehouse Securitization Program: Summary Of Terms," dated January 26, 2004 at p.1.

### B. AHMIC Acquires Subordinated Notes With Funds Advanced By Lehman

15. On or about June 8, 2005, AHMIC purchased the Series 2005-A Notes from Lehman in the aggregate principal face amount of $53,125,000 (the "**2005 Note Purchase**"). On July 11, 2007, AHMIC acquired additional Subordinated Notes from Lehman, purchasing Series 2004-A Notes in the aggregate principal face amount of $31,000,000 (the "**2007 Note Purchase**"). Collectively, the Subordinated Notes purchased in the 2005 Note Purchase and the 2007 Note Purchase shall be referred to as the "**AHMIC-Owned Notes**").

16. Lehman agreed to finance both the 2005 Note Purchase and the 2007 Note Purchase under the parties' pre-existing Master Repurchase Agreement that AHMIC, Lehman Commercial Paper, and Lehman, Inc. executed previously on November 4, 2003 (the "**MRA**"). A copy of the MRA is attached hereto as Exhibit A.

17. On July 13, 2007, with respect to loans advanced in connection with both the 2005 Note Purchase and the 2007 Note Purchase, Lehman agreed to advance 75% of the Subordinated Notes' market price (set for financing purposes at 97% of the notes' face value). Thus, AHMIC's effective outstanding advance rate from Lehman on that date was 72.75% of face value, or $61,200,938.

### C. MRA Terms

18. Under the MRA, AHMIC was the "Seller" of the AHMIC-Owned Notes, and one or more entities comprising or affiliated with Lehman was the "Buyer" of the AHMIC-Owned Notes. The AHMIC-Owned Notes were the "Purchased Securities" under the MRA (as defined therein).

19. The MRA contained provisions entitling the Buyer to make margin calls in the event the market value of the Purchased Securities -- as determined by a "generally recognized source" -- fell below the original market value (on the initial purchase date), such that the outstanding loan exceeded the contemplated borrowing base:

> If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a '**Margin Deficit**'), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional securities reasonably acceptable to Buyer ('Additional Purchased Securities'), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

Ex.A, (MRA, p. 4 (§ 4)).

20. The agreement defined "**Market Value**" to mean "the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein ..." Ex. A, p. 2 (§ 2(j)). See also id. p. 2 (§ 2(c) (defining "Buyer's Margin Amount" to mean "with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date")); p.2 (§ 2(d) (defining "Buyer's Margin Percentage" to mean "with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price for Such Transaction")).

21. The failure of the Seller to maintain the Buyer's Margin Amount as required by section 4 of the MRA constituted an "Event of Default" under the MRA. Ex. A (MRA, p. 7 (§ 11(ii)).

**D.    July 23, 2007 Margin Call**

22. Between June 2005 and March 2007, Lehman did not make any margin calls with respect to the Subordinated Notes. On March 16, 2007, Lehman made its first margin call, asserting the Market Value had fallen to 92.27% of the notes' face value. AHMIC satisfied that margin call. When AHMIC purchased the Subordinated Notes from Lehman on July 13,

2007, however, Lehman established the Market Value for the Subordinated Notes at 97% of the notes' face value.

23. Within four days of the closing of the 2007 Note Purchase, on July 17, 2007, Lehman advised AHMIC that the Market Value of the Subordinated Notes had precipitously declined by six hundred basis points, i.e., from 97% of their face value (on July 13, 2007) to 91% of their face value (on July 17, 2007).

24. After AHMIC advised Lehman it did not agree that the Market Value had dropped to 91% the notes' face value, Lehman agreed to restore the Market Value to 97% of the notes' face value.

25. On July 23, 2007, Lehman advised AHMIC again that the Market Value of the Subordinated Notes had fallen to 91% of their face value.

26. Lehman took the position that the borrowing base securing the funds it advanced under the MRA declined by $3,785,625 during the prior week and that the amount of funds it was willing to advance dropped from $61,200,938 (75% of 97% of the notes' face value) to $57,415,313 (75% of 91% of the notes' face value).

27. Lehman maintained this supposed drop entitled Lehman to make a margin call and demanded that AHMIC immediately pay Lehman $3,785,625 as the Margin Deficit (hereinafter, the "**First Margin Call**") in order to keep AHMIC within the borrowing base of 75% of Market Value.

28. AHMIC did not agree with Lehman's characterization of this supposed drop in Market Value to 91% of the notes' face value. Nonetheless, it satisfied, in full, the First Margin Call on July 23, 2007.

29. Upon payment of the alleged Margin Deficit, Lehman's effective outstanding advance rate for AHMIC's acquisition of the Subordinated Notes was reduced from 72.75% of their face value to 68.25% of their face value (i.e., 75% of 91% of their face value).

### E. July 26, 2007 Margin Call

30. Three days after the First Margin Call, on July 26, 2007, Lehman advised AHMIC that the value of the Subordinated Notes had taken a nosedive during the prior three days -- falling to just 80% of their face value.

31. Lehman took the position that the borrowing base securing the funds it advanced under the MRA declined by $6,940,313 during the prior week and that the amount of funds it was willing to advance to AHMIC dropped from $57,415,313 (75% of 91% of the notes' face value) to $50,475,000 (75% of 80% of the notes' face value).

32. Lehman maintained this supposed drop entitled Lehman to make a second margin call and demanded that AHMIC immediately pay to Lehman $6,940,313 as a Margin Deficit (hereinafter, the "**Second Margin Call**") in order to keep AHMIC within the borrowing base of 75% of Market Value.

33. AHMIC did not satisfy the Second Margin Call.

34. At the time of the Second Margin Call, Lehman did not have the July 2007 monthly portfolio summary report which would have shown the extent to which delinquencies and defaults for the mortgage loans had increased or decreased from the prior month. Lehman also knew that (a) AHMIC was facing financial difficulties due to liquidity problems with its warehouse lenders; (b) the Market Value had not changed over the prior three days (since the First Margin Call) because there was no "generally recognized source" for trading the Subordinated Notes; (c) over the prior three days (since the First Margin Call), the rating of the Subordinated Notes had not been downgraded, and the SPEs' assets had not changed to justify market depreciation; (d) the SPEs had swap agreements designed to mitigate the risk of value degradation; (e) there were no significant trades of the Subordinated Notes other than Lehman's own sale of the Subordinated Notes to AHMIC at 97% of face value 15 days before the Second Margin Call.

35. At all times, Lehman was required to act in a commercially reasonable manner and in good faith. In making the Second Margin Call, Lehman took advantage of AHMIC's financial difficulty and breached the express terms of the Master Repurchase Agreement and all modicums of good faith, fair dealing, and commercial reasonableness.

### F. Pre-Petition Default Notice

36. On August 1, 2007, just days before the American Home Parties commenced the Chapter 11 Cases, Lehman sent a notice asserting that the failure to pay the Second Margin Call constituted an Event of Default and that Lehman reserved its rights to take action with respect to the Subordinated Notes (the "**Pre-Petition Default Notice**").

37. The Pre-Petition Default Notice was delivered in breach of the MRA because, inter alia, the alleged default -- AHMIC's failure to honor the Second Margin Call -- did not constitute a legitimate Event of Default.

38. Lehman violated the terms of the MRA in making the Second Margin Call. The MRA directed Lehman to look to a "generally recognized source" when assessing the Market Value of the Subordinated Notes. Lehman did not look to a "generally recognized source," and instead manufactured its own Market Value and a corresponding Margin Deficit as part of a scheme to deprive AHMIC of the true value of the AHMIC-Owned Notes. Lehman also unjustifiably pointed to the crisis of confidence in the mortgage arena instead of giving a fair, good faith valuation of the Subordinated Notes.

39. To the extent Lehman maintains that it (i.e., Lehman) is a "generally recognized source" as a market maker with respect to the Subordinated Notes, Lehman had an obligation to act in good faith, without conflicts of interest, and in a commercially reasonable manner in calculating Market Value. Lehman did none of this.

### G. Post-Petition Termination Attempts

40. On August 6, 2007 (the "**Petition Date**"), AHMIC and its affiliated debtors and debtors in possession each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

41. On August 27, 2007, after the Petition Date, Lehman notified AHMIC that it had terminated the MRA and that it either had foreclosed or intended to foreclose on the AHMIC-Owned Notes in lieu of selling them to a third party (the "**Post-Petition Foreclosure Notice**").

42. Lehman notified AHMIC that the market value of the Subordinated Notes for purposes of calculating the price at liquidation was 68.25% of face value -- coincidentally, the effective outstanding advance rate on the Subordinated Notes following the First Margin Call.

43. As of the date hereof, Lehman has held itself out to third parties, including the Indenture Trustee with respect to the Subordinated Notes, as the owner of the AHMIC-Owned Notes.

44. Lehman's alleged termination on August 27, 2007 and foreclosure was part of a scheme to keep the valuable Subordinated Notes rather than sell them into a dysfunctional and aberrational market.

45. At all times, Lehman was required to act in a commercially reasonable manner. Lehman's foreclosure and/or liquidation of the AHMIC-Owned Notes has not complied with the applicable standards of commercial reasonableness.

### COUNT I

**(Breach of Contract)**

46. AHMIC incorporates by reference the allegations contained in paragraphs 1 through 45 of the Complaint.

47. Lehman and AHMIC are parties to the MRA.

48. At all relevant times, AHMIC performed its obligations under the MRA.

49. The MRA required that Lehman act in all instances in good faith in accordance with the implied covenant of good faith and fair dealing.

50. Lehman did not calculate Market Value in accordance with the MRA with respect to the Second Margin Call and wrongfully triggered that margin call by, inter alia, (a) misrepresenting the existence of, or overstating the Margin Deficit and (b) ascribing an overly depressed Market Value to the Subordinated Notes.

51. To the extent Lehman maintains that it (i.e., Lehman) is a "generally recognized source" as a market maker with respect to the Subordinated Notes, Lehman failed to satisfy its obligation to act in good faith, without conflicts of interest, and in a commercially reasonable manner in calculating Market Value.

52. Lehman was not entitled to issue either the Pre-Petition Default Notice or the Post-Petition Foreclosure Notice, because (a) AHMIC at all relevant times complied with its obligations under the MRA and (b) an Event of Default (as defined therein) had not occurred.

53. At all times, Lehman was required to act in a commercially reasonable manner. Lehman has not complied with or approached the applicable standards of commercial reasonableness.

54. Lehman's actions constitute a material breach of the MRA, including, without limitation, a material breach of the implied covenant of good faith and fair dealing with respect to the MRA and a breach of all modicums of good faith, fair dealing, and commercial reasonableness.

55. Lehman's breach of the MRA has damaged AHMIC in an amount not less than $84,125,000, less the amounts advanced by Lehman, plus costs and attorneys' fees.

## COUNT II

### (Turnover Of Property Of The Estate (11 U.S.C. § 542))

56. AHMIC incorporates by reference the allegations contained in paragraphs 1 through 55 of the Complaint.

57. Lehman and AHMIC are parties to the MRA.

58. Lehman owes a debt to AHMIC under the MRA that is property of AHMIC and that is matured, payable on demand, or payable on order.

59. Lehman is in possession, custody, and control of property that AHMIC may use, sell or lease under section 363 of the Bankruptcy Code.

60. All or a portion of the AHMIC-Owned Notes and their proceeds (less any funds advanced by Lehman) constitute property of AHMIC's estate under section 541 of the Bankruptcy Code.

61. Lehman should be directed to turnover either (a) the AHMIC-Owned Notes to AHMIC's estate or (b) in the event that the safe harbor provisions of the Bankruptcy Code apply, the debt owed by Lehman for damages arising from Lehman's termination of the MRA and foreclosure and/or liquidation of the AHMIC-Owned Notes**.**

## COUNT III

### (Conversion)

62. AHMIC incorporates by reference the allegations contained in paragraphs 1 through 61 of the Complaint.

63. Under the MRA, AHMIC provided Lehman with a limited interest in the AHMIC-Owned Notes for the sole purpose of their serving as collateral with respect to AHMIC's obligations to repay the funds Lehman advanced under that agreement.

64. Lehman's limited interest in the AHMIC-Owned Notes was at all times subject to AHMIC's right to retake possession of those notes in exchange for the principal loan borrowed by AHMIC (plus accrued interest).

65. Lehman has interfered with AHMIC's right to possess the AHMIC-Owned Notes, will not deliver possession of those notes to AHMIC, and wrongly claims an ownership interest with respect to the AHMIC-Owned Notes.

66. As a direct and proximate result of Lehman's wrongful interference with AHMIC's rights to possess the AHMIC-Owned Notes, AHMIC has suffered, and will continue to suffer damages.

67. By reason of the foregoing acts of confiscating the AHMIC-Owned Notes for itself rather than returning possession of the AHMIC-Owned Notes to AHMIC (their rightful owners), Lehman is liable to AHMIC for conversion.

## COUNT IV

**(Unjust Enrichment)**

68. AHMIC incorporates by reference the allegations contained in paragraphs 1 through 67 of the Complaint.

69. The AHMIC-Owned Notes served solely as collateral to secure AHMIC's obligations under the MRA and were subject to AHMIC's right to retake possession thereof in exchange for the principal amount borrowed from Lehman under the MRA (plus accrued interest).

70. Lehman violated the terms of the MRA with respect to the Second Margin Call because the MRA directed Lehman to look to a "generally recognized source" when assessing the Market Value of the Subordinated Notes.

71. Lehman did not look to a "generally recognized source" when assessing the Market Value of the Subordinated Notes, instead manufacturing its own Market Value and a

corresponding Margin Deficit as part of a scheme to deprive AHMIC of the true value of the AHMIC-Owned Notes.

72. Given its intimate understanding of the Subordinated Notes, Lehman was well aware that the notes had a higher Market Value than that represented by Lehman in connection with the Second Margin Call.

73. Lehman's foreclosure and/or liquidation of the AHMIC-Owned Notes was part of a scheme to keep the valuable Subordinated Notes rather than sell them into a dysfunctional and aberrational market.

74. At all times, Lehman was required to act in a commercially reasonable manner. Lehman has not complied with the applicable standards of commercial reasonableness.

75. By reason of the foregoing acts, Lehman has been unjustly enriched at AHMIC's expense by wrongfully foreclosing upon and/or liquidating for itself the AHMIC-Owned Notes that (a) AHMIC was entitled to take repossession of at the conclusion of the MRA and (b) had a higher Market Value than the amounts Lehman represented in connection with the Second Margin Call.

76. As a direct and proximate result of Lehman's unjust enrichment, AHMIC has suffered and will continue to suffer damages.

## COUNT V

**(Declaratory Judgment)**

77. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 76 of the Complaint.

78. This claim for relief arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

79. Lehman maintains that (a) AHMIC's failure to satisfy the Second Margin Call constitutes an Event of Default under the MRA; (b) the MRA was terminated prior to the Petition Date; and (c) Lehman was entitled to foreclose upon and/or liquidate the AHMIC-Owned Notes. AHMIC disputes each of these assertions.

80. An actual, justiciable controversy exists. The Court should declare that:

(a) Lehman violated the automatic stay imposed under section 362(a) of the Bankruptcy Code by terminating the MRA and foreclosing on and/or liquidating the AHMIC-Owned Notes;

(b) the MRA is not a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code because the Subordinated Notes do not meet the definition of "mortgage related securities (as defined in section 3 of the Securities and Exchange Act of 1934)" when they were rated "BBB" by Standard & Poor's and "Baa2" by Moody's;

(c) Lehman is not entitled to the "securities contract" safe harbor of section 555 of the Bankruptcy Code because the Lehman entity that was counterparty to the MRA and the relevant transactions relating to the Subordinated Notes is not a "stockbroker, financial institution, financial participant, or securities clearing agency;"

(d) (i) Lehman's foreclosure and/or liquidation of the AHMIC-Owned Notes, is governed by Article 9 of the N.Y.U.C.C., § 901, et seq., and, at all times Lehman was required to act in a commercially reasonable manner and (ii) any damages AHMIC incurred as a consequence of Lehman's failure to comply with those standards and Article 9 shall be determined in accordance with section 562 of the Bankruptcy Code; and

(e) alternatively, even if (i) the MRA is a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code or (ii) Lehman is entitled to the safe harbor of section 555 of the Bankruptcy Code, then the determination of damages owed by Lehman must be made in accordance with section 562 of the Bankruptcy Code because commercially reasonable determinants of value do not exist.

**PRAYER FOR RELIEF**

WHEREFORE, the AHMIC respectfully requests that this Court enter judgment in its favor and grant the following relief:

a) judgment in favor of AHMIC on all claims set forth herein;

b) the entry of an Order directing Lehman to turnover the AHMIC-Owned Notes within five (5) business days of the entry of such Order, 11 U.S.C. § 542;

c) Declaratory Judgment of the Court decreeing that Lehman violated the automatic stay imposed under section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a);

d) Declaratory Judgment of the Court decreeing that the MRA is not a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code, 11 U.S.C. § 101(47);

e) Declaratory Judgment of the Court decreeing that Lehman is not entitled to the safe harbor of section 555 of the Bankruptcy Code, 11 U.S.C. § 555;

f) Declaratory Judgment of the Court decreeing that any and all actions taken by Lehman in connection with its foreclosure and/or liquidation of the AHMIC-Owned Notes are governed by Article 9 of the N.Y.U.C.C., § 901, et seq.;

g) Declaratory Judgment of the Court decreeing that even if (i) the MRA is a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code or (ii) Lehman is entitled to the safe harbor of section 555 of the Bankruptcy Code, then the determination of damages owed by Lehman must be made in accordance with section 562 of the Bankruptcy Code because commercially reasonable determinants of value do not exist; and

h) judgment awarding AHMIC's costs and attorneys' fees; and

Any other, further relief the Court deems just and appropriate.

Dated: October 24, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert S. Brady*
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Pauline K. Morgan (No. 3650)
Erin D. Edwards (No. 4392)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-AND-

QUINN EMANUEL URQUHART
OLIVER & HEDGES LLP
Susheel Kirpalani
James C. Tecce
51 Madison Avenue
New York, New York 10010
Telephone: (212) 849-7000

Counsel for Debtors and
Debtors in Possession